S. SEEDING SERV., INC. v. W.C. ENGLISH, INC.

[224 N.C. App. 90 (2012)]

SOUTHERN SEEDING SERVICE, INC.
v.
W.C. ENGLISH, INC.; LIBERTY MUTUAL INSURANCE COMPANY; AND TRAVELERS
CASUALTY & SURETY COMPANY OF AMERICA

No. COA12-636

Filed 4 December 2012

**Costs—breach of contract—cost calculation—attorney fees**

The trial court did not err in a breach of contract case by awarding damages and attorney fees to plaintiff. The 18 November 2008 invoice and the accompanying itemized accounting of all of plaintiff's actual costs incurred after 1 July 2007 were evidence that a reasonable mind could accept as adequate to support the trial court's finding that plaintiff's cost calculation was correct. Further, the award of attorney fees was permissible pursuant to N.C.G.S. § 44A-35.

Appeal by defendants from Amended Judgment entered 8 March 2012 by Judge Shannon R. Joseph in Guilford County Superior Court. Heard in the Court of Appeals 24 October 2012.

*Conner Gwyn Schenck, PLLC, by A. Holt Gwyn and Timothy R. Wyatt, for Plaintiff-appellee.*

*Ragsdale Liggett, PLLC, by William W. Pollock and Amie C. Sivon, for Defendant-appellants.*

HUNTER, JR., Robert N., Judge.

Liberty Mutual Insurance Company ("Liberty Mutual"), Travelers Casualty & Surety Company of America ("Travelers") (collectively, "the sureties"), and W.C. English, Inc. ("English") (collectively "Appellants") appeal from an Amended Judgment entered 8 March 2012 by Judge Shannon R. Joseph in Guilford County Superior Court in favor of Southern Seeding Service, Inc. ("Southern Seeding"). Appellants argue that the trial court erred in awarding damages and attorneys' fees to Southern Seeding. We affirm.

## I. Factual and Procedural History

On 15 July 2003, the North Carolina Department of Transportation ("NCDOT") initiated and published provisions for a construction project (the "Project") concerning the Western Loop of Interstate 40 in

Greensboro. Shortly thereafter APAC-Atlantic, Inc. ("APAC") was hired as the general contractor on the Project. APAC in turn executed a Contract Payment Bond with NCDOT, as required by N.C. Gen. Stat. § 44A-26, which guaranteed payment to all subcontractors and material suppliers on the Project. Liberty Mutual and Travelers signed as sureties to the payment bond. APAC entered into a subcontract with English on 9 September 2003 for the grading, erosion control, and grassing services of the Project. On 8 September 2003, English entered into a contract with Southern Seeding to perform grassing services on the Project. The subcontract between Southern Seeding and English contained, in pertinent part, the following provision:

> Unit prices herein quoted are based upon the assumption that the contract will be completed within time as specified in the specifications at time of bidding. Should our work be delayed beyond said time without fault on our part, unit prices herein quoted shall be equitably adjusted to compensate us for increased cost . . . .

NCDOT's provisions specified that the Project should have been completed by 1 July 2007, the date upon which Southern Seeding relied in preparing the equitable adjustment clause. Nowhere in the subcontract between Southern Seeding and English was the phrase "equitable adjustment" explicitly defined.

Southern Seeding began working on the Project on 26 September 2003. Through no fault of its own, Southern Seeding's work on the Project continued well past the Project's scheduled completion date. The record reveals that English's failure to properly complete the erosion work on time prior to seeding was responsible in some part for the delays.

Southern Seeding regularly sent English letters regarding the delays and increasing costs throughout their work on the Project. On 29 June 2006, Southern Seeding sent English a memo about the delays and cost increases, asserting that they would not be responsible for any liquidated damages charged to English for the delays. On 13 July 2006, Southern Seeding sent another memo to English regarding the extra expenses created by English's failures to complete the erosion work. The memo stated: "We have been put, and continue to be put to extreme extra expense in our work due to the manner in which the erosion control work has been managed." APAC was copied on this memo.

On 4 October 2007, in what the parties' refer to as the "Supplemental Seeding" agreement, APAC requested that Southern

Seeding perform work outside of the original bid. On 24 October 2007 Southern Seeding sent another memo to English complaining of delays and price increases, and informing English that it was "keeping detailed records on all items, quantities, costs, etc. since July 1 [2007] in order to furnish the necessary information to make fair and equitable adjustments in unit prices." On 4 December 2007 Southern Seeding notified English of: (a) its intention to file a claim against them, (b) its plan to file a claim for extra costs for the Supplemental Seeding work from NCDOT, and (c) that it was keeping track of all costs incurred after 1 July 2007 for purposes of calculating and recovering an equitable adjustment.

The Project was not completed until 21 March 2008, over 250 days past 1 July 2007, the scheduled completion date. Southern Seeding performed roughly one-third of its work after 1 July 2007. On 24 March 2008 Southern Seeding notified English that it had completed work on the Project.

Southern Seeding demanded payment for work performed after the completion date. On 17 July 2008 it sent a letter to APAC informing them and their sureties that it would file a claim against the payment bond if English did not pay them for the Supplemental Seeding work and the work completed after the scheduled completion date. On 13 November 2008 English replied that it needed actual certified payrolls and invoices for work performed after the completion date before it could assess any additional compensation claim.[1]

On 23 February 2009 Southern Seeding demanded: (a) payment for the Supplemental Seeding work, and (b) money owed because of work performed after the completion date. On 10 June 2009 English responded, offering Southern Seeding $35,424.44 for the Supplemental Seeding work and $2,300.00 for the work performed after the scheduled completion date. On 16 June 2009, Southern Seeding rejected the offer, and demanded $75,140.80 for the Supplemental Seeding work and $194,941.39 for the work performed after the completion date. On 30 June 2009, English sent a letter to Southern Seeding with a check for $77,440.80 in an effort to settle both claims: (a) the Supplemental Seeding work, and (b) the work performed after the completion date. On 6 July 2009 Southern Seeding returned and rejected the check, and notified English of Southern Seeding's intent to bring legal action.

---

1. In making these demands English seems to have given an example of what it considered to be an appropriate calculation of cost increases, or at least an example of what figures it would need to make an appropriate calculation.

**S. SEEDING SERV., INC. v. W.C. ENGLISH, INC.**

[224 N.C. App. 90 (2012)]

On 23 September 2009, Southern Seeding filed a complaint in Guilford County Superior Court, claiming: (1) that English breached its subcontract with Southern Seeding by failing to pay Southern Seeding $194,941.39 under the equitable adjustment clause for the increased costs of materials, labor, and equipment accrued after 1 July 2007, and (2) that Liberty Mutual and Travelers are liable to Plaintiff for payment under the payment bond because of English's failure to compensate Southern Seeding for its work on the Project.[2]

After a bench trial, the trial court entered judgment denying Southern Seeding's requested relief, holding that "English was not obligated to equitably adjust Southern Seeding's unit prices for increased cost, if any, arising from working past 1 July 2007." Southern Seeding appealed the trial court's decision to this Court on 3 November 2010. This Court held "that the trial court erred in concluding that [Southern Seeding] [wa]s not entitled to an equitable adjustment," and "reverse[d] and remand[ed] to the trial court for further proceedings consistent with" its opinion. *Southern Seeding Serv. v. W.C. English, Inc.*, ___ N.C. App. ___, ___, 719 S.E.2d 211, 216 (2011).[3]

On remand and following a bench trial on the merits, the trial court found that Southern Seeding's "invoice of 18 November 2008 represented a reasonable, equitable adjustment to the Subcontract to compensate Southern Seeding for its actual costs for work performed after 1 July 2007." Furthermore, the trial court held that "English's unreasonable refusal to equitably adjust the Subcontract, to compensate Southern Seeding for its actual costs for work performed after 1 July 2007, constitute[d] material breach of the Subcontract, and proximately caused damages to Southern Seeding in the amount of $194,941.39." Accordingly, the court held that Southern Seeding "[wa]s entitled to recover a money judgment against Defendants, jointly and severally, in the amount of $194,941.39, plus interest at the rate of eight percent (8%) per annum from 18 December 2008, until paid." The trial court's calculation of damages was based upon:

---

2. Southern Seeding appears to have received satisfactory payment for the Supplemental Seeding work, as it does not argue the issue on appeal. Evidence of such satisfaction in the record is scant, though Southern Seeding concedes in its brief that "English paid . . . for the Overrun Tasks and Extra Work Tasks[.]"

3. This Court also held that "Liberty Mutual and Travelers Casualty [were] liable to [Southern Seeding] as sureties on the payment bond." *Southern Seeding Serv.*, ___ N.C. App. at ___, 719 S.E.2d at 217.

(i) the escalation language in Paragraph 15 of the Subcontract, (ii) the actual production rate incurred by Southern Seeding's forces after 1 July 2007 (as distinct from Southern Seeding's work productivity prior to 1 July 2007, which was less productive and more costly), (iii) NCDOT's prior approval of a $45.00 labor/equipment rate per man-hour for Southern Seeding's forces to overrun items, and (iv) English's prior agreement to a $45.97 labor/equipment rate per man-hour for Southern Seeding's extra work performed by Southern Seeding for English (for which NCDOT was not responsible).

In addition, the trial court held that since Southern Seeding "is the prevailing party in this action as defined in N.C. Gen. Stat. § 44A-35 and there was an unreasonable refusal by English to fully resolve the matter which constituted the basis of the suit[,]" English was required, pursuant to N.C. Gen. Stat. § 44A-35 to pay Southern Seeding reasonable attorneys' fees "in the total amount of $24,310.50[.]"

## II.  Jurisdiction

Jurisdiction rests in this Court pursuant to N.C. Gen. Stat. § 7A-27(b) (2011), as Appellants appeal from a final judgment of the Superior Court as a matter of right.

## III.  Analysis

English argues that the trial court erred: (1) by awarding damages to Southern Seeding "that were speculative and not supported by the evidence" and (2) by awarding attorneys' fees to Southern Seeding under N.C. Gen. Stat. § 44A-35, "because neither the principal nor the sureties failed to make payment and English is not a party to the bond." We disagree.

### A.  Equitable Adjustment

As English acknowledges, North Carolina law does not provide a legal definition for the term "equitable adjustment."[4] The contract between the parties is similarly silent as to the term's meaning. Nothing in the record suggests the parties implicitly or explicitly contemplated the methodology which was to be used in calculating any "equitable adjustment."

---

4. English observes that "[u]nfortunately, there are no North Carolina cases that provide any guidance on how to apply an equitable adjustment clause for labor and materials cost increases."

S. SEEDING SERV., INC. v. W.C. ENGLISH, INC.

[224 N.C. App. 90 (2012)]

At trial, Ralph Stout, the president of Southern Seeding, testified that, in calculating the "equitable adjustment," he compared his original bid amount for the per-unit costs with the per-unit costs after 1 July 2007. Mr. Stout testified that Southern Seeding sought the following: the per-unit costs of doing work after 1 July 2007 minus the original per-unit bid amount.

John Jordan, English's senior vice president, in turn testified that he believed Southern Seeding's claim was for damages incurred after 1 July 2007 and that he defined "equitable adjustment" as "the difference in the cost of [] materials." Mr. Jordan, while silent on the matter of the methodology used to determine the equitable adjustment, testified that he thought the rates used in Southern Seeding's calculation for materials and labor were "overstated." He did testify, however, that the quantities were "probably accurate." Thus, it appears the parties disagreed on the rates used in the calculation, not the calculation methodology itself.

"Equitable adjustment" can be defined by the parties to a contract. Normally, standard form contracts or government contracts allocate the risks of an equitable adjustment to the parties by providing an accounting methodology by which the parties can calculate the amount of any adjustment. However, in the absence of such express terms, as is the case here, the courts are left to examine industry custom, usage, and practice in determining the method of damage calculation.

The American Institute of Architects ("AIA") defines "equitable adjustment" as a remedy for contract breach that is calculated as "a price based upon cost plus overhead and profit." 1 Jonathan J. Sweet, *Sweet on Construction Industry Contracts Major AIA Documents* § 13.03 (5th ed. 2009). The "Government Contracts Cyclopedic Guide to Law, Administration, [and] Procedure" defines "equitable adjustment" as "the difference between the cost of the work required by the contract and the cost of the changed work, plus profit, whether or not the fair market value is the same. The object is to make the contractor whole." 4 John Cosgrove McBride & Thomas J. Touhey, *Government Contracts Cyclopedic Guide to Law, Administration, Procedure* (Walter A. I. Wilson ed. 2009). This treatise further notes that the "term 'equitable adjustment' has a long history and has become a term of art in government contracts. With respect to profit, the consistent practice is to allow it on work actually done[.]" *Id.*

Regarding delay damages, the treatise holds that "[i]n a suit for breach of contract grounded on delay caused by the government's

defective specifications, the contractor's recovery is not limited to a time extension, but encompasses whatever monetary damages the contractor can prove that resulted from the government fault." *Id.* The treatise goes into detail regarding how an equitable adjustment is to be calculated:

> As a general proposition, a contractor can recover under the changes clause all of the increases in cost which can be shown to result directly from the defects or extra corrective work required. This recovery can include costs of delays directly resulting from government errors, loss of labor efficiency, disruption of the work sequence and acceleration costs. Recovery of any of these costs is subject to proof of the relationship of the claimed costs to the work as changed. . . .

> The amount of an equitable adjustment is a factual issue to be resolved insofar as possible by ascertaining the actual cost to the contractor, with the addition of a reasonable and customary allowance for profit. . . .

> As a general rule, the proper method for computing an equitable adjustment in price is the reasonable cost of the extra labor and materials plus appropriate overhead markups, plus profit. The actual costs incurred by the contractor are presumptively reasonable and are regarded as sufficient to establish a prima facie case for recovery.

*Id.* The treatise later notes that "[w]hen an equitable adjustment is made, it must include overhead as an element." *Id.* In summary, an equitable adjustment is a breach of contract remedy ascertained via a factual analysis of the actual costs to the contractor of the additional or un-contracted-for work, including overhead and a reasonable profit. *Id.*

This methodology is consistent with that utilized by Southern Seeding and the trial court to calculate the equitable adjustment due Southern seeding. Indeed, English does not ask this Court to establish a standard by which an equitable adjustment should be calculated in North Carolina. Thus, in the absence of evidence in the record that the term "equitable adjustment" had an agreed upon meaning, and in light of North Carolina law's silence on a legal definition for the term, we must treat Southern Seeding's award as the result of a breach of contract damages calculation. It appears from

**S. SEEDING SERV., INC. v. W.C. ENGLISH, INC.**

[224 N.C. App. 90 (2012)]

the record that Southern Seeding, and the trial court, utilized a "benefit of the bargain" method under the guise of calculating an "equitable adjustment." And since English only argues on appeal that the rates and dates used in this calculation are not supported by competent evidence, we review on appeal only whether competent evidence exists to support the factual conclusions of the trial court's damages calculation, not the methodology itself.

**B. Competent evidence exists to support the trial court's finding that Southern Seeding's calculation of costs for work performed after 1 July 2007 is correct.**

We review conclusions of law from a bench trial *de novo. Town of Green Level v. Alamance County,* 184 N.C. App. 665, 668-69, 646 S.E.2d 851, 854 (2007). The trial court's findings of fact are binding on appeal if there is competent evidence to support them. *Biemann and Rowell Co. v. Donohoe Cos., Inc.,* 147 N.C. App. 239, 242, 556 S.E.2d 1, 4 (2001). Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding. *Eley v. Mid/East Acceptance Corp. of N.C., Inc.,* 171 N.C. App. 368, 369, 614 S.E.2d 555, 558 (2005).

On appeal, English contends that the trial court erred in relying on the equitable adjustment cost calculation Southern Seeding submitted because: (1) Southern Seeding used the wrong date in their costs calculation, (2) Southern Seeding failed to present evidence to prove its calculation accurately reflected its actual costs after 1 July 2007, and (3) Southern Seeding's calculation includes items other than materials and costs. Since these are questions of fact, our review on appeal is limited to a determination of whether there was competent evidence before the trial court to support its findings. *Biemann,* 147 N.C. App. at 242, 556 S.E.2d at 4. Thus, the issue in this case can be stated as follows: Is there competent evidence to support the trial court's finding that Southern Seeding's cost calculation is correct? The record answers this question in the affirmative.

The trial court found:

> Southern Seeding's invoice of 18 November 2008 represented a reasonable, equitable adjustment to the Subcontract to compensate Southern Seeding for its actual costs for work performed after 1 July 2007, based on (i) the escalation language in Paragraph 15 of the Subcontract, (ii) the actual production rate incurred by

Southern Seeding's forces after 1 July 2007 (as distinct from Southern Seeding's work productivity prior to 1 July 2007, which was less productive and more costly), (iii) NCDOT's prior approval of a $45.00 labor/equipment rate per man-hour for Southern Seeding's forces to overrun items, and (iv) English's prior agreement to a $45.97 labor/equipment rate per man-hour for Southern Seeding's extra work performed by Southern Seeding for English (for which NCDOT was not responsible).

Plaintiff's Exhibit 30, a spreadsheet specifically detailing an itemized account of all of Southern Seeding's actual costs of materials and labor incurred after 1 July 2007, accompanied the invoice the court referenced above. The spreadsheet includes clear, detailed lists of the amount of materials used, how much per unit the materials had cost, when the materials were expended, and the amount and rate of man-hours utilized on which dates.

The trial court clearly found this invoice and the accompanying spreadsheet as competent evidence to show: (1) Southern Seeding correctly used 1 July 2007 as its starting date, (2) the calculation represented actual costs, and (3) the calculation properly included only material, labor, and costs. The spreadsheet details each of these items with clarity and specificity.

"When we review an order from a non-jury trial, 'we are strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal . . . .' " *Holloway v. Holloway*, ___ N.C. App. ___, ___, 726 S.E.2d 198, 204 (2012) (quoting *State v. Williams*, 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008)). The 18 November 2008 invoice, and the accompanying itemized accounting of all of Southern Seeding's actual costs incurred after 1 July 2007, is evidence that a reasonable mind could accept as adequate to support the trial court's finding that Southern Seeding's cost calculation is correct. Therefore, we affirm.

## C. The trial court correctly determined that English owed attorneys' fees to Southern Seeding.

This Court reviews a trial court's award of attorneys' fees for an abuse of discretion. *Bruning & Federle Mfg. Co. v. Mills*, 185 N.C. App. 153, 155, 647 S.E.2d 672, 674, *disc. review denied*, 362 N.C. 86, 655 S.E.2d 837 (2007). Whether an award of attorneys' fees is allow-

able pursuant to statute is reviewable *de novo*. *Id.* at 156, 647 S.E.2d at 674.

The trial court awarded attorneys' fees to Southern Seeding in the amount of $24,310.50 pursuant to N.C. Gen. Stat. § 44A-35, after finding that Southern Seeding was "the prevailing party in this action . . . and there was an unreasonable refusal by English to fully resolve the matter which constituted the basis of the suit." English argues it does not owe attorneys' fees "because neither the principal nor the sureties failed to make payment and English is not a party to the bond." We disagree.

Since English does not contest the amount of attorneys' fees, but only whether they should have been awarded pursuant to N.C. Gen. Stat. § 44A-35, we review whether the trial court's award of attorneys' fees was permissible under that statute *de novo* as a question of law.

N.C. Gen. Stat. § 44A-35 (2011) states, in pertinent part:

> In any suit brought or defended under the provisions of Article 2 or Article 3 of this Chapter, the presiding judge may allow a reasonable attorneys' fee to the attorney representing the prevailing party. This attorneys' fee is to be taxed as part of the court costs and be payable by the losing party upon a finding that there was an unreasonable refusal by the losing party to fully resolve the matter which constituted the basis of the suit or the basis of the defense. For purposes of this section, "prevailing party" is a party plaintiff or third party plaintiff who obtains a judgment of at least fifty percent (50%) of the monetary amount sought in a claim . . . .

N.C. Gen. Stat. § 44A-35. Thus, the statute requires the satisfaction of two elements for attorneys' fees to be properly awarded: (1) the party so awarded must be the prevailing party, and (2) the party being required to pay attorneys' fees must have unreasonably refused to resolve the matter.

English does not contend that Southern Seeding was not the prevailing party, but does proffer three arguments as to why an award of attorneys' fees was inappropriate. First, it contends, "the obligations of the payment bond are not triggered until there has been a default under the bond, which has not occurred here." Second, English claims that they cannot be ordered to pay attorneys' fees because they are not "a party to the payment bond[.]" Finally, English argues

that it does not owe attorneys' fees because it was not obligated to pay the equitable adjustment funds until the trial court entered the Amended Judgment, and thus English did not unreasonably refuse to settle. Each contention is without merit.

English's first two arguments are misplaced. Though the payment bond is relevant to matters of payment of damages and equitable adjustment following a breach of contract, it has no bearing on an award of attorneys' fees pursuant to N.C. Gen. Stat. § 44A-35. The statute is clear regarding the only elements that must be met for an award: (1) the party so awarded must be the prevailing party, and (2) the party being required to pay the fees must have unreasonably refused to resolve the matter that constituted the suit. N.C. Gen. Stat. § 44A-35. Since the trial court found that each of these elements was satisfied, English's arguments with respect to the payment bond are misplaced.

English's third and final argument is that it did not unreasonably refuse to settle because it was not obligated to pay the equitable adjustment funds until the trial court entered the Amended Judgment. Put differently, English contends that their duty to settle did not arise until they were ordered by the court to pay Southern Seeding damages. This notion is inconsistent with North Carolina law.

In *Terry's Floor Fashions, Inc. v. Crown General Contractors, Inc.*, a property owner and a general contractor failed to pay a sub-contractor for work the sub-contractor had performed. 184 N.C. App. 1, 6, 645 S.E.2d 810, 814 (2007). After its attempts to get paid were met with dismissiveness by the general contractor and property owner, the sub-contractor filed suit against both of them in order to recover. *Id.* at 7, 645 S.E.2d at 814. After winning the lawsuit in 2005, the sub-contractor "filed a motion to recover attorneys fees pursuant to N.C. Gen. Stat. § 44A-35. In support of its motion, [the sub-contractor] alleged that defendant [property owner] had 'unreasonably refus[ed] to fully resolve [the] matter which constituted the basis of this suit.' " *Id.* at 8, 645 S.E.2d at 815 (third and fourth alterations in original).

As evidence of the defendants' unreasonable refusal to settle the matter, the sub-contractor, and subsequently the trial court, relied upon correspondence between the parties conducted prior to judgment, not actions taken after judgment. *Id.* at 8-9, 645 S.E.2d at 815-16. Specifically, the trial court noted that two letters written before the trial court's judgment by the property owner indicating its

**S. SEEDING SERV., INC. v. W.C. ENGLISH, INC.**

[224 N.C. App. 90 (2012)]

refusal to settle the matter manifested evidence of defendants' unreasonable refusal to settle. *Id.*

After considering the trial court's findings of fact regarding the defendants' pre-trial refusals to settle, this Court affirmed the ruling of the trial court, noting that the defendants' actions prior to judgment manifested an unreasonable refusal to settle and that, as a result, "the trial court's award of attorneys fees was the product of a reasoned decision." *Id.* at 18, 645 S.E.2d at 821.

The facts in the case *sub judice* are very similar to those in *Terry*. Southern Seeding, like the sub-contractor in *Terry*, was not appropriately paid for work it performed for the defendants. After failed attempts to secure payment, Southern Seeding, like the sub-contractor in *Terry*, took the matter to trial. The defendants in *Terry*, like those in the facts at hand, lost at trial and were required to pay attorneys' fees under N.C. Gen. Stat. § 44A-35. And just as the defendants in *Terry* were found to have unreasonably refused to settle specifically because of their actions taken or not taken prior to judgment, so also is English guilty of unreasonably refusing to settle because of actions taken or not taken prior to judgment. Thus, English's contention—that it was not obligated to pay the equitable adjustment funds until the trial court entered the Amended Judgment and thus did not unreasonably refuse to settle—is without merit.

Accordingly, we hold that the trial court's award of attorneys' fees to Southern Seeding was permissible pursuant to N.C. Gen. Stat. § 44A-35. The judgment of the trial court is

AFFIRMED.

Judges HUNTER, Robert C. and CALABRIA concur.